Alkemal Sing. Pte. Ltd. v. DEW Glob. Fin., LLC, 2018 NCBC 35.

STATE OF NORTH CAROLINA

HENDERSON COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 1406

ALKEMAL SINGAPORE PRIVATE
LTD,

Plaintiff,

v.

DEW GLOBAL FINANCE, LLC; and
DONALD E. WASHINGTON III,

Defendants.

**OPINION AND FINAL JUDGMENT**

1.     **THIS MATTER** came on for trial without a jury before the undersigned on March 19, 2018.  The matter is now ripe for final determination, and the Court issues its Opinion and Final Judgment.

>   *Tuggle Duggins P.A., by Richard W. Andrews, Jeffrey S. Southerland, and Clinton H. Cogburn, for Plaintiff.*
>
>   *The Law Firm of John C. Hensley, Jr., P.C., by John C. Hensley, Jr., for Defendants.*

Robinson, Judge.

## I.     INTRODUCTION

2.     Plaintiff Alkemal Singapore Private, Ltd. ("Plaintiff" or "Alkemal") and Defendants DEW Global Finance, LLC ("DEW") and Donald E. Washington, III ("Washington") negotiated a transaction whereby Defendants would procure for Plaintiff, or would introduce Plaintiff to an investor who would procure for Plaintiff, a $20 million leased standby letter of credit ("SBLC") in exchange for Plaintiff paying Defendants a service fee of $2.6 million.  The service fee represented thirteen percent

of the instrument's value and was to be held in escrow until the instrument was authenticated.

3. In negotiating the transaction, Plaintiff and Defendants dealt with each other almost entirely through a third-party intermediary, with multiple versions of different agreements being exchanged between them. The parties disagree as to which agreement or agreements were intended to govern the transaction. Plaintiff contends that the parties entered into and were bound by a document entitled "Joint Escrow Instructions," which obligated Defendants to hold the service fee in an escrow account until Plaintiff was given a reasonable opportunity to verify the authenticity of the SBLC. Defendants contend that the Joint Escrow Instructions did not constitute a controlling or operative and enforceable contract between the parties because the parties entered into a Bank Instrument Lease Agreement and a separate Funds Release Escrow Agreement, pursuant to which Defendants' only obligations were to (1) introduce Plaintiff to a provider who could issue the SBLC and (2) deliver the service fee to an agreed upon third-party escrow agent.

4. After Plaintiff wired the $2.6 million service fee to Defendants, Defendants retained a portion of the fee before forwarding the remainder of the funds to a third party within an hour of Plaintiff's wire transfer. Plaintiff never received the SBLC, and the documents received by Plaintiff purporting to show that a SBLC had been issued were later determined to be fraudulent. Plaintiff never received a refund of any portion of the service fee it delivered to Defendants.

5. Based on the following Findings of Fact and Conclusions of Law, the Court issues its Opinion and Final Judgment that the parties entered into and were bound by the Joint Escrow Instructions; that DEW breached the terms thereof; that in retaining Plaintiff's funds, DEW converted Plaintiff's property; and that all other claims for relief are denied. Therefore, Plaintiff is entitled to compensatory damages in the amount of $2.6 million plus prejudgment interest at the legal rate and Plaintiff's reasonable costs in prosecuting this action against DEW.

## II. PROCEDURAL HISTORY

6. Plaintiff initiated this action on August 19, 2015 by filing a Complaint, with a demand for a jury trial, asserting claims against Defendants for breach of contract, breach of fiduciary duty, constructive fraud, fraud, negligent misrepresentation, civil conspiracy, conversion, unfair and deceptive trade practices ("UDTP"), unjust enrichment, constructive trust, and an accounting. (Compl. 5–14, ECF No. 1.)

7. This action was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated August 21, 2015, (ECF No. 3), and assigned to the Honorable Louis A. Bledsoe, III, Special Superior Court Judge for Complex Business Cases, by order dated August 24, 2015, (ECF No. 4). This case was later reassigned to the undersigned by order dated July 5, 2016. (ECF No. 42.)

8. On October 23, 2015, Defendants filed an answer in which Defendants requested a jury trial. (ECF No. 12.)

9.     After completion of discovery, on July 31, 2017, Plaintiff filed a Motion for Partial Summary Judgment.  (ECF No. 76.)  After briefing on Plaintiff's Motion for Partial Summary Judgment was complete, Defendants filed a Motion to Amend Answer on October 2, 2017.  (ECF No. 85.)

10.     Following a hearing on the motions, the Court entered an Order and Opinion denying both motions.  (ECF No. 93.)  The Court set this matter for trial to begin on March 19, 2018 in Henderson County, North Carolina.  (ECF No. 94.)

11.     On February 2, 2018, the parties entered a joint stipulation withdrawing their respective jury demands and consenting to trial of this action by the Court sitting without a jury.  (ECF No. 95.)

12.     On March 12, 2018, Plaintiff and Defendants filed their respective proposed findings of fact and conclusions of law.  (ECF Nos. 98–99.)

13.     Beginning on March 19, 2018, the parties, through their counsel, presented evidence to the Court at trial in the form of two live witnesses, various exhibits, and deposition testimony.  Following conclusion of the trial, Plaintiff and Defendants submitted additional proposed findings of fact and conclusions of law on April 3, 2018.  (ECF Nos. 101–02.)

14.     All issues and claims are now ripe for resolution.

### III.     FINDINGS OF FACT

15.     Based on the evidence properly considered by the Court, the Court makes the following Findings of Fact.  Any determination later stated as a conclusion of law

that should have been stated as a finding of fact is incorporated into these Findings of Fact.

16. Plaintiff is a private limited company organized under the laws of Singapore that primarily engages in the international timber trade. Daljit Singh ("Singh") is a director of Alkemal, and Puneeta Singh Wasan ("Wasan") is Singh's daughter and the manager of Alkemal. Neither Singh nor Wasan are parties to this litigation.

17. DEW is a Florida limited liability company that maintains its principal office and place of business in Henderson County, North Carolina. DEW was formed in 2010 and does business as Criss-Cross Financial Group ("Criss-Cross"). For purposes of this Opinion, DEW, sometimes doing business as Criss-Cross, will be referred to as "DEW."

18. Washington is the president and managing member of DEW.

19. In the summer of 2014, Alkemal had already purchased timber in Myanmar but was required to pay between $15 and $20 million to the Myanmar Timber Enterprise, a government agency, before September 30, 2014 to avoid confiscation of its cargo. In order to make the necessary payment, Alkemal sought financing from a third party.

20. The Bridging Edge, a Singapore company, put Alkemal in contact with Mike Mwara ("Mwara"), a representative of CB Morgan Capital Group and a non-party to this litigation.

21. After Wasan explained Alkemal's financing needs, Mwara proposed that Alkemal lease a SBLC that Alkemal could then use as collateral for a bank loan to pay the amounts owed for the timber. (Pl.'s Ex. 8.) Throughout much of September 2014, Wasan and Mwara communicated regularly about the proposed transaction. (*See, e.g.*, Pl.'s Exs. 8–9, 11–13.) During these discussions, Wasan explained that Alkemal needed the SBLC by September 29, 2014 to avoid confiscation of its cargo. (*See* Pl.'s Exs. 8, 15–16.)

22. Mwara, having previously referred other transactions to DEW, contacted Washington to inquire whether DEW would be willing to assist with the transaction. Washington was made aware of Alkemal's deadline before agreeing to assist Alkemal in obtaining the SBLC.

23. On September 22, 2014, Mwara informed Alkemal that DEW would issue the SBLC on Alkemal's behalf. (Pl.'s Ex. 13.) Thereafter, Wasan, on behalf of Alkemal, and Washington, on behalf of DEW, communicated almost entirely by e-mail through Mwara.

24. On Wednesday, September 24, 2014, Mwara e-mailed Wasan a copy of DEW's service proposal and instructed her to review, execute, and return the documents at her earliest convenience so that Plaintiff's deadline could be met. (Pl.'s Ex. 16.)

25. The service proposal stated that "[i]f [DEW] and/or one of our investment partners decide to facilitate the Alkemal transaction[,]" the "most likely terms" of the agreement would provide that Scotia Bank, or a similar bank, would issue a $20

million leased SBLC to Alkemal. (Defs.' Ex. A, § 1.) The service proposal stated that Alkemal must submit certain documents to proceed with the transaction, including proof of funds, a corporate resolution authorizing the transaction, and a copy of the contract governing the underlying transaction. (Defs.' Ex. A, § 1.) On the copy of the service proposal submitted by both Plaintiff and Defendants, a number of these items were struck through as having been received by Washington, including the requirement that Alkemal submit a copy of the governing contract. (Defs.' Ex. A, § 1; Pl.'s Ex. 16, at 2, § 1.)

26. The service proposal also stated that it was standard protocol to require Alkemal to execute a service agreement before proceeding with the transaction. (Defs.' Ex. A, § 2.) In exchange for DEW's services, Alkemal was to pay a service fee of $2.6 million. (Defs.' Ex. A, § 3.) The service proposal was signed by Washington as president/CEO of DEW and by Singh as a director of Alkemal. (Defs.' Ex. A, at 4.)

27. Alkemal submitted the required directors' resolution to Defendants, asserting that Alkemal accepted the service proposal and authorized Singh to execute any related agreements. (Defs.' Ex. B.)

28. During the course of negotiations, Defendants, through Mwara, presented Alkemal with several different written documents as draft proposed agreements. The parties dispute which documents governed the agreement between them.

29. The Joint Escrow Instructions ("Escrow Instructions") identified the parties to the agreement as DEW, on the one hand, and Singh, on the other, both individually and in his capacity as a director of Alkemal. (Defs.' Ex. C, § 1.01.) The Escrow

Instructions identified DEW as both "Provider" and "Escrow Holder," and identified Alkemal as the "Client." (Defs.' Ex. C, at 1.) The Escrow Instructions referenced Washington only to: (1) identify him as escrow officer, (Defs.' Ex. C, at 1, 5–6; Ex. A to Defs.' Ex. C); (2) instruct that notices to DEW should be directed to Washington, (Defs.' Ex. C, § 5.05); and (3) record his acknowledgement of acceptance of the Escrow Instructions "for and on behalf of DEW[,]" (Defs.' Ex. C, at 6). Nowhere do the Escrow Instructions define the rights or duties of the escrow officer. Washington signed the Escrow Instructions on behalf of DEW as its president. (Defs.' Ex. C, at 5–6; Ex. A, add. A to Defs.' Ex. C.)

30. The Escrow Instructions stated that "[Alkemal] has requested Provider to introduce [Alkemal] to an Investor" who is able to cause the issuance of a $20 million SBLC. (Defs.' Ex. C, § 2.03.) In exchange, DEW was to receive "a reasonable fee for services in acting as Escrow Holder in fulfilling these Instructions and in the performance of its duties as Escrow Holder pursuant to Escrow Holder's letter agreement with Provider." (Defs.' Ex. C, § 3.03.) The Escrow Instructions provided that DEW's fee would be $2.6 million. (Defs.' Ex. C, § 4.01.)

31. The Escrow Instructions provided that, immediately upon their execution, Alkemal was to deposit a financial services fee of $2.6 million into DEW's bank account. (Defs.' Ex. C, § 4.01.) Upon receipt of the fee, DEW was to deliver to Alkemal "any reasonable document that evidence[d]" that DEW had obtained the $20 million SBLC. (Defs.' Ex. C, §§ 4.02–.03.) Upon delivery of such documentation, Alkemal was to have three banking days to verify that the SBLC documents were genuine.

(Defs.' Ex. C, § 4.03.) If Alkemal failed to notify DEW, in writing, within three banking days that the documents were "not acceptable due to specifically identified misrepresentations or fraud," DEW would be entitled to close escrow and retain the $2.6 million fee. (Defs.' Ex. C, § 4.04.) If Alkemal objected to the documents, DEW would have two business days to correct the deficiency or DEW would be obligated "immediately thereafter [to] refund the entire . . . [f]ee" to Alkemal. (Defs' Ex. C, § 4.04.) If the provider failed to issue the SBLC within seven days of execution of the Escrow Instructions, Alkemal was entitled to a refund of all funds that remained in escrow. (Defs.' Ex. C, § 4.05.)

32. The Escrow Instructions prohibited DEW, as Escrow Holder, from "mak[ing] any disbursement of funds except as described" in the Escrow Instructions. (Defs.' Ex. C, Art. IV.) The Escrow Instructions also prohibited assignment or delegation of the parties' rights and duties, (Defs.' Ex. C, § 5.07); required any amendment or cancellation of the instructions to be in writing, executed by all parties, (Defs.' Ex. C, § 5.03); and prohibited an oral waiver of terms or conditions, instead requiring that any waiver be in writing and executed by the party whom the waived term or condition was intended to benefit, (Defs.' Ex. C, § 5.06).

33. The Escrow Instructions would "become binding on the date last executed by a Party and only upon execution by all Parties." (Defs.' Ex. C, § 5.10.)

34. Defendants introduced into evidence three versions of a Bank Instrument Lease Agreement (the "Lease Agreement"). (Defs.' Exs. D–E, I.) All three versions of the Lease Agreement are nearly identical except for: (a) the date stated at the

beginning of each document; (b) the parties to the agreement; (c) the amount of the leasing fee; and (d) the signatures on the agreement. (*Compare* Defs.' Ex. D, *with* Defs.' Exs. E, I.)

35. Each version of the Lease Agreement was created and provided by Avion Consulting Group, LLC ("Avion"), an entity that DEW solicited to provide the SBLC. Timothy Carr ("Carr") was the Avion representative with whom Washington communicated regarding the issuance of a SBLC.

36. Each version of the Lease Agreement generically identified the parties to the agreement as: (a) the applicant's representative and (b) the lessee of the SBLC. (*E.g.*, Defs.' Ex. D, at 1.) The Lease Agreement provided that the applicant's representative, Avion, acted on behalf of itself and an undisclosed lessor "who is willing to use a credit facility at a certain bank or banks to cause the issuance of a [SBLC] . . . which the [l]essee agrees to lease[.]" (*E.g.*, Defs.' Ex. D, at 1.)

37. The Lease Agreement provided that the lessee and the applicant's representative were to reach agreement on certain primary documents: the Lease Agreement, a lease application, and an Escrow Funds Release Agreement, all of which were to be attached to the Lease Agreement as exhibits. (*E.g.*, Defs.' Ex. D, ¶ D.13(i)b, e.) After the primary documents were executed, the lessee was to deposit a leasing fee "with the [e]scrow [a]gent and thereby into the [e]scrow account to be governed pursuant to the Escrow Funds Release Agreement." (*E.g.*, Defs.' Ex. D, ¶ D.13(i)f.)

38.     Under each version of the Lease Agreement, after the investor's bank (the "issuing bank") delivered the SBLC to the lessee's bank (the "receiving bank"), the escrow agent was obligated "to authenticate that the notification was in fact directly sent to the [e]scrow [a]gent from the [i]ssuing [b]ank." (*E.g.*, Defs.' Ex. D, ¶ D.13(i)h (emphasis omitted).) The escrow agent could fulfill this duty by e-mailing the bank officer at the issuing bank who handled the transaction. (*E.g.*, Defs.' Ex. D, ¶ D.13(i)h.) The escrow agent was also obligated to authenticate that the SBLC transmission receipt showed certain authentication results and transaction codes, which purportedly demonstrate that the transmission had occurred. (*E.g.*, Defs.' Ex. D, ¶ D.13(i)h.) After authentication was complete, the escrow agent was to release the leasing fee to the applicant's representative. (*E.g.*, Defs.' Ex. D, ¶ D.13(i)h.) If the escrow agent determined that the documents were not sent by the issuing bank, or if the escrow agent did not authenticate that the transmission receipt had the required results and codes, then the escrow agent was to close escrow and deliver all remaining funds back to the lessee. (*E.g.*, Defs.' Ex. D, ¶ D.13(ii).) The Lease Agreement further provided that if the SBLC was not issued and delivered to the receiving bank within thirty days after the fee was deposited in escrow, the escrow agent was to close the escrow account and deliver all remaining funds back to the lessee. (*E.g.*, Defs.' Ex. D, ¶ D.13(iii).)

39.     Each version of the Lease Agreement referred to several other documents to be attached to the Lease Agreement as exhibits. Exhibit A was the Lease Application, which provided that the lessee "underst[ood] and agree[d] that we

[would] utilize an independent escrow agent and escrow agreement, both defined in Exhibit C. [sic] attached hereto." (*E.g.*, Ex. A to Defs.' Ex. D.) An attachment to the Lease Application provided that the required leasing fee would be "paid into an escrow with a third party escrow[.]" (*E.g.*, sched. 2 to Ex. A to Defs.' Ex. D.) Exhibit B set out the leasing fee to be paid by Alkemal for issuance of the SBLC. (*E.g.*, Ex. B to Defs.' Ex. D.) Exhibit C was a blank page titled "Escrow Agreement (Three Party Escrow Agreement)," to which no other document was attached. (*E.g.*, Ex. C to Defs.' Ex. D.)

40. Defendants also introduced into evidence a Funds Release Escrow Agreement (the "Funds Release Agreement"), which bears a similar but not identical title to the primary document identified in each version of the Lease Agreement as the "Escrow Funds Release Agreement." (*Compare* Defs.' Ex. J, *with* Defs.' Ex. D, ¶ D.13(i)b(3).) The parties listed in the Funds Release Agreement were: (a) Avion; (b) DEW and Alkemal, together as lessee; and (c) Velocity Partners, Ltd. ("Velocity") as escrow agent. (Defs.' Ex. J, at 1.)

41. The Funds Release Agreement stated that "Avion and the [l]essee desire to release the Escrowed Funds pursuant to the terms of the Escrow Agreement[.]" (Defs.' Ex. J, at 1.) The Funds Release Agreement provided procedures for the issuance of the SBLC and the release of escrowed funds that are identical to those in the Lease Agreements. (*Compare* Defs.' Ex. J, §§ 2–3, *with* Defs.' Ex. I, ¶ D.13.)

42. Because of the inconsistencies between the Escrow Instructions, on the one hand, and the Lease Agreement and Funds Release Agreement, on the other hand, it

would be impossible for Defendants to simultaneously comply with both sets of documents. The Escrow Instructions gave Alkemal the right to verify the authenticity of the SBLC before the funds could be released, whereas the Lease Agreement and Funds Release Agreement placed an obligation on the escrow agent to verify the authenticity of the SBLC but gave no such right to Alkemal. (*Compare* Defs.' Ex. C, §§ 4.03–.04, *with* Defs.' Ex. D, ¶ D.13(i)h, *and* Defs.' Ex. J, § 2(i)h.) The Escrow Instructions unquestionably obligated DEW to hold the $2.6 million in escrow for up to three banking days to give Plaintiff an opportunity to verify the authenticity and issuance of the SBLC, (Defs.' Ex. C, Art. IV, §§ 4.04–.05), whereas the Lease Agreement created no such obligation, (*e.g.*, Defs.' Ex. D, ¶ D.13(i)h), and the Funds Release Agreement named Velocity as escrow agent, (Defs.' Ex. J, at 1).

43. The timestamps on the e-mails sent between Mwara, Washington, and Wasan were sent from two, or potentially three, different time zones. Mwara is believed to have been located either on the East Coast or in Houston, Texas, and was thus in either the Eastern or Central Time Zone of the United States. Washington (and as a result DEW) was located in North Carolina, which is in the Eastern Time Zone. Wasan was located in Singapore, which is twelve hours ahead of the Eastern Time Zone. After careful review of the evidence presented, the Court finds that the communications between the parties and the resulting transaction proceeded as follows, with all times stated as Eastern Time unless otherwise indicated.

44. After Alkemal accepted DEW's service proposal, which was sent on September 24, 2014, Wasan was provided a Lease Agreement dated September 25,

2014 (the "September 25th Lease Agreement") and a copy of the Funds Release Agreement.

45. The September 25th Lease Agreement named Avion as the applicant's representative and Alkemal as the lessee and set the leasing fee for the transaction at $2.6 million. (Defs.' Ex. D, at 1; Ex. B to Defs.' Ex. D.) Exhibit C was an otherwise blank page indicating that an Escrow Agreement was attached, but no such document was attached. (Ex. C to Defs.' Ex. D.)

46. Wasan was not comfortable with the September 25th Lease Agreement because the authentication procedures offered very little protection for Alkemal and required that Velocity act as escrow agent. Wasan's biggest concern was wiring money to Velocity because she did not know Velocity's representative, Peter McLaughlin ("McLaughlin"), and had not dealt with him. Wasan expressed these concerns to Mwara. Nevertheless, Singh signed the agreement on Alkemal's behalf on September 26, 2014. (Defs.' Ex. D, at 13, Ex. A & scheds. 1–2, 4, Ex. B.)

47. At 9:02 a.m. on September 26, after the September 25th Lease Agreement had been sent, reviewed, and signed by Singh on behalf of Alkemal, and after Wasan expressed concerns about the security of the transaction process, Washington sent the Escrow Instructions (naming Washington as escrow officer and DEW as escrow holder) to Mwara, instructing Mwara to "have [his] clients review, execute and return ASAP." (Pl.'s Ex. 19.) Within a half hour of receiving the Escrow Instructions, Wasan responded that she had authorized the wire transfer and would send the agreement the next day because she could not print the agreement at that time. (Pl.'s Ex. 20.)

Washington, on behalf of DEW, signed the Escrow Instructions on September 26, 2014. (Defs.' Ex. C, at 5.) The Escrow Instructions were also executed by Alkemal.

48. At approximately 1:30 p.m. on September 26, 2014, Washington, on behalf of DEW, electronically signed a subsequent Lease Agreement dated September 26, 2014 (the "September 26th Lease Agreement") naming Avion as the applicant's representative and naming both Alkemal and DEW as "[l]essee." (Defs.' Ex. E, at 1, 13.) Except as explained below, the September 26th Lease Agreement was otherwise identical to the September 25th Lease Agreement. (*Compare* Defs.' Ex. D, *with* Defs.' Ex. E.)

49. Although a mark similar to Singh's signature appears on the September 26th Lease Agreement, the pages bearing Singh's signature were photocopied from the previously signed September 25th Lease Agreement and inserted into the September 26th Lease Agreement without his knowledge or consent. The signatures on the September 25th and September 26th Lease Agreements are identical in appearance and placement on each respective page of the two documents. (*Compare* Defs.' Ex. D, at 13–16, 18–19, *with* Defs.' Ex. E, at 13–16, 18–19.) Additionally, the first page of the September 25th Lease Agreement contained definitions numbered 1 through 11, continuing onto the next page with definition number 12. (Defs.' Ex. D, at 1–2.) The September 26th Lease Agreement did not include a definition number 11. (Defs.' Ex. E, at 1–2.) Definition number 11 was omitted from the September 26th Lease Agreement because the addition of DEW as lessee added a line of text to the first page of the agreement. (Defs.' Ex. E, at 1–2.) Thus, in order to be able to

use the pages from the September 25th Lease Agreement that contained Singh's signature as his purported signature on the September 26th Lease Agreement, definition 11 was omitted to maintain the pagination and spacing for the remainder of the document.

50. Washington denies any knowledge of how the September 26th Lease Agreement was slip-sheeted or who did it. Before trial, Wasan had not seen the September 26th Lease Agreement naming both Alkemal and DEW as lessee.

51. At 1:49 p.m. on September 26, 2014, Washington, on behalf of DEW, affixed his electronic signature to a Funds Release Agreement that named Velocity, rather than DEW, as the escrow agent. (Defs.' Ex. F, at 1, 8.) The Funds Release Agreement stated that the leasing fee was $2.2 million, notwithstanding the fact that the September 26th Lease Agreement, which Washington signed roughly twenty minutes earlier, set the fee at $2.6 million. (*Compare* Ex. B to Defs.' Ex. E, *with* Defs.' Ex. F, at 8.)

52. Wasan wired the $2.6 million to DEW's bank account on Monday, September 29, 2014 in reliance on DEW's designation as escrow holder in the Escrow Instructions and the fact that Alkemal would have three banking days to verify the SBLC's authenticity before any funds could be released from escrow.

53. Sometime after Wasan wired the funds, a third lease agreement was executed, dated September 29, 2014 (the "September 29th Lease Agreement"). (*See* Defs.' Ex. I.) The September 29th Lease Agreement named Avion as the applicant's representative but listed only DEW as the lessee, having deleted Alkemal as a party.

(Defs.' Ex. I, at 1.) Washington believed he was authorized to execute the September 29th Lease Agreement on Alkemal's behalf because Singh had executed the September 25th Lease Agreement; however, Washington did not tell Alkemal that the September 29th Lease Agreement did not list Alkemal as a party because he considered it to be irrelevant. In contrast to the earlier Lease Agreements, the September 29th Lease Agreement set the leasing fee at $2.2 million. (Ex. B to Defs.' Ex. I.) As with the earlier Lease Agreements, Exhibit C was an otherwise blank page that referenced an attached escrow agreement, but no such document was attached. (Ex. C to Defs.' Ex. I.) Washington, on behalf of DEW, signed the September 29th Lease Agreement, which was also signed by Carr on behalf of Avion. (Defs.' Ex. I, at 13.)

54. In addition to the September 29th Lease Agreement, Defendants introduced into evidence the Funds Release Agreement, (Defs.' Ex. J), which Washington testified was the parties' final escrow agreement and was intended to be Exhibit C to the September 29th Lease Agreement. The signature page of the Funds Release Agreement was dated September 26, (Defs.' Ex. J, at 8), and was electronically signed by Washington on that date, (Defs.' Ex. F, at 8). The Funds Release Agreement was also signed by Carr on behalf of Avion and by McLaughlin on behalf of Velocity. (Defs.' Ex. J, at 8.) Carr and McLaughlin signed the agreement by hand, and McLaughlin's signature was dated September 29, 2014. (Defs.' Ex. J, at 8.) The Funds Release Agreement was not signed by anyone on Alkemal's behalf.

(*See* Defs.' Ex. J, at 8.) The executed Funds Release Agreement set the leasing fee at $2.2 million. (Defs.' Ex. J, at 8.)

55.     Although Singh signed the September 25th Lease Agreement on Alkemal's behalf, Alkemal neither saw nor agreed to be bound by later versions of the Lease Agreement or the Funds Release Agreement. Because Alkemal did not agree to be bound by the September 26th or September 29th Lease Agreements or the Funds Release Agreement, those documents do not constitute agreements between Plaintiff and Defendants.

56.     The terms of the September 25th Lease Agreement materially differed from those of the September 26th and September 29th Lease Agreements in that the parties, the service fee, or both were changed. (*Compare* Defs.' Ex. D, at 1, *and* Ex. B to Defs.' Ex. D, *with* Defs.' Ex. E, at 1, Ex. B to Defs.' Ex. E, Defs.' Ex. I, at 1, *and* Ex. B to Defs.' Ex. I.) Prior to trial, Wasan had never seen a document listing DEW, either solely or along with Alkemal, as lessee or stating that the leasing fee was $2.2 million rather than $2.6 million. Had she seen such an agreement, it would have raised red flags as to what was going to happen to the other $400,000 of the $2.6 million service fee being paid for the SBLC.

57.     Within an hour of Wasan wiring $2.6 million to DEW, DEW retained $400,000 as its service fee before releasing the remainder of the funds to Velocity. Washington testified that DEW had agreed to pay Mwara $200,000 for his services rendered in the transaction. From the $400,000 retained by DEW, Mwara was paid $10,000 of the $200,000 that was to have been Mwara's fee, but DEW withheld the

remaining $190,000 of Mwara's fee because the transaction was still in flux. (*See* Pl.'s Ex. 7.)

58. When asked if the Escrow Instructions were part of DEW's agreement with Alkemal and whether DEW and Washington were obligated to act pursuant to the Escrow Instructions, Washington's testimony was "sort of, kind of."

59. Alkemal did not receive the SBLC by the deadline for paying the Myanmar Timber Enterprise. As a result, Alkemal forfeited to the Myanmar Timber Enterprise the shipload of lumber it was purchasing and for which Alkemal had already paid approximately $20 million.

60. On September 30, 2014, Wasan e-mailed Washington requesting that the $2.6 million be refunded to Alkemal "as per the Escrow Agreement" because the SBLC had not been timely issued. (Pl.'s Ex. 25, at 3.) Washington and Wasan exchanged e-mails over the next several days wherein Wasan repeatedly requested a refund and information on why the SBLC had not been received, and Washington replied that he was working on a solution. (Pl.'s Exs. 25, 28.) In e-mails sent by Wasan on October 2, 2014, Wasan told Washington that "you are my escrow and the money is to be sitting with you till [sic] there is confirmation on the SBLC receipt" and "you are my escrow and I am unaware of any further agreements you have behind the scene [sic][.]" (Pl.'s Ex. 28, at 1.) None of the e-mails introduced into evidence demonstrate that Washington denied that DEW was obligated under the Escrow Instructions or that the Escrow Instructions did not control the method for releasing funds from escrow.

61. On October 2, 2014, McLaughlin, on behalf of Velocity, e-mailed Washington to inform him that "escrow ha[d] been closed upon conditions in the agreement having been met[.]" (Pl.'s Ex. 26, at 2.) McLaughlin then described how the conditions required by the Lease Agreements and the Funds Release Agreement had been met. (Pl.'s Ex. 26, at 2; *see also* Defs.' Exs. D–F, I–J.) Washington responded to McLaughlin's e-mail within the hour, stating that "[t]he instrument ha[d] not been received by the intended party, and I did not authorize the closure of escrow." (Pl.'s Ex. 26, at 1.) Washington forwarded these e-mails to Mwara, who then forwarded them to Wasan on Thursday, October 2, 2014. (Pl.'s Ex. 26, at 1.)

62. The parties agree that Plaintiff was the victim of a fraudulent scheme by unknown third parties. As a result, the $2.6 million wired by Alkemal to DEW for the issuance of a $20 million SBLC was lost.

63. Plaintiff learned on October 2, 2014 that DEW had forwarded the escrowed funds to Velocity in violation of the terms of the Escrow Instructions.

## IV. CONCLUSIONS OF LAW

64. Based on the foregoing Findings of Fact, the Court makes the following Conclusions of Law.

65. The Court has jurisdiction over the parties and the subject matter of this action.

66. This case was properly designated as a mandatory complex business case and assigned to the undersigned, who has authority to make Findings of Fact

following the completion of the trial and the submission of all disputed issues for resolution by the Court without a jury.

67. The parties waived their right to a jury trial on this action.

68. The parties tendered thirty exhibits, which the Court admitted into evidence for purposes of this bench trial. The Court also received testimony by Plaintiff's two witnesses appearing at trial, Wasan and Washington.

69. Any Findings of Fact that are more appropriately deemed Conclusions of Law are incorporated by reference as the Court's Conclusions of Law.

A. **Breach of Contract**

70. Plaintiff alleges that the Escrow Instructions are a valid and binding contract and that Defendants breached the agreement by failing to procure the leased SBLC and failing to hold Plaintiff's funds in escrow until the instrument had been obtained. (Compl. ¶¶ 35, 37–38.)

71. Under North Carolina law, a claim for breach of contract requires (1) the existence of a valid contract and (2) breach of the terms thereof. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000).

72. "The well-settled elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms." *Se. Caissons, LLC v. Choate Constr. Co.*, 784 S.E.2d 650, 654 (N.C. Ct. App. 2016). "It is axiomatic that a valid contract between two parties can only exist when the parties assent to the same thing in the same sense . . . ." *Normile v. Miller*, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985) (quotation marks omitted). "This mutual assent and the

effectuation of the parties' intent is normally accomplished through the mechanism of offer and acceptance." *Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980). In discussing offer and acceptance, our Court of Appeals has stated:

> Ordinarily one party, by making an offer, assents in advance; the other, upon learning of the offer, assents by accepting it and thereby forms the contract. The offer may be communicated directly or through an agent; but information received by one party that another is willing to enter into a bargain is not necessarily an offer. The test is whether the offer is so made as to justify the accepting party in a belief that the offer is made to him.

*Schwarz v. St. Jude Med., Inc.*, 802 S.E.2d 783, 789 (N.C. Ct. App. 2017) (quoting Restatement (Second) of Contracts § 23, cmt. a). "Whether mutual assent is established and whether a contract was intended between the parties are questions for the trier of fact." *Creech v. Melnik*, 347 N.C. 520, 527, 495 S.E.2d 907, 911 (1998).

73. Plaintiff's evidence that Defendants, through Mwara, presented Plaintiff with an offer to proceed under the Escrow Instructions, requesting that Wasan review it, execute it, and return it "ASAP," demonstrates that Defendants made an offer that justified Alkemal in believing that Defendants intended to be bound upon acceptance.

74. Alkemal's acceptance of Defendants' offer is adequately demonstrated by Wasan's conduct, which occurred within thirty minutes of receiving the offer, in sending the initial wire transfer and saying she would send the signed agreement the next day.

75. The Court therefore concludes that the Escrow Instructions are a binding contract.

76. Defendants argue that the Escrow Instructions cannot be enforced because Plaintiff failed to produce a signed copy or demonstrate that a signed copy was transmitted to Defendants. The Court finds this argument unavailing.

77. Defendants admitted in their Answer that Plaintiff and Defendants signed the Escrow Instructions, pursuant to which DEW and Washington would act as escrow holder and escrow officer, respectively, and that Alkemal wired the funds to DEW as required by that agreement. (Answer and Crosscls. of DEW and Washington, ¶¶ 16, 18, ECF No. 12.) "It is well settled that parties are bound by admissions and allegations within their pleadings unless withdrawn, amended or otherwise altered pursuant to [Rule] 15." *Webster Enters., Inc. v. Selective Ins. Co. of the Se.*, 125 N.C. App. 36, 41, 479 S.E.2d 243, 247 (1997). Defendants' motion to amend their answer to retract this admission was denied by this Court.

78. Even had Defendants been permitted to amend their Answer, the evidence admitted at trial showed that Alkemal did in fact execute the Escrow Instructions. Further, even if this finding is in error, the fact that a party seeking to enforce an agreement did not execute the agreement is not fatal to a breach of contract claim, even where the agreement expressly stated that it was not binding until fully executed, as did the Escrow Instructions. "The object of a signature to a contract is to show assent, but the signing of a written contract is not necessarily essential to its validity. Assent may be shown in other ways, such as acts or conduct or silence." *Burden Pallet Co. v. Ryder Truck Rental, Inc.*, 49 N.C. App. 286, 289, 271 S.E.2d 96, 97 (1980); *see also Fid. & Cas. Co. of N.Y. v. Charles W. Angle, Inc.*, 243 N.C. 570,

575–76, 91 S.E.2d 575, 579 (1956) (holding that an agreement that was not executed by plaintiff was enforceable and noting that a "signature is not always essential to the binding force of an agreement" and that "mutuality or assent . . . may be shown in other ways" such as whether it "is delivered and acted on"); *W.B. Coppersmith & Sons, Inc. v. Aetna Ins. Co.*, 222 N.C. 14, 17, 21 S.E.2d 838, 840 (1942) ("The signing of a written contract is not necessarily essential to its validity. It is equally efficacious if a written contract is prepared by one party and delivered to the other party, and acquiesced in by the latter without objection."); *Walker v. Goodson Farms, Inc.*, 90 N.C. App. 478, 487, 369 S.E.2d 122, 127 (1988) (holding that "the parties' failure to execute a written contract does not preclude the creation of an enforceable agreement").

79. Defendants' arguments that Plaintiff waived the Escrow Instructions' requirements or entered into a substitute agreement are equally unavailing. For a waiver to exist, "[t]here must always be an intention to relinquish a right, advantage or benefit." *42 E., LLC v. D.R. Horton, Inc.*, 218 N.C. App. 503, 509, 722 S.E.2d 1, 6 (2012). Such an intention "may be expressed or implied from acts or conduct that naturally leads the other party to believe that the right has been intentionally given up." *Id.* This is true even where the contract provides that any modification must be in writing. *Id.* at 511, 722 S.E.2d at 7.

80. As to the substitution of a new agreement for an old agreement, "[i]t is clear that parties may modify their agreement by entering into a new contract prescribing their rights and liabilities in regard to the entire subject matter and the new

agreement amounts to a novation." *Penney v. Carpenter*, 32 N.C. App. 147, 149, 231 S.E.2d 171, 173 (1977); *see also Bowles v. BCJ Trucking Servs., Inc.*, 172 N.C. App. 149, 153, 615 S.E.2d 724, 727 (2005) ("Novation may be defined as a substitution of a new contract or obligation for an old one which is thereby extinguished."). "[T]he essential requisites of a novation are a previous valid obligation, the agreement of all the parties to the new contract, the extinguishment of the old contract, and the validity of the new contract." *Bowles*, 172 N.C. App. at 153, 615 S.E.2d at 727.

81. The Court has found, by the greater weight of the evidence, that Plaintiff signed the September 25th Lease Agreement before it was presented with and agreed to be bound by the Escrow Instructions. It necessarily follows that the earlier September 25th Lease Agreement cannot replace or modify the subsequent Escrow Instructions. Further, having found that Plaintiff was never presented with the later versions of the Lease Agreements, the Court cannot conclude that Plaintiff assented to those agreements by virtue of its initial agreement to the September 25th Lease Agreement, particularly where material terms such as the parties and the service fee had been modified without Plaintiff's knowledge or consent. Because Defendants have not established that Plaintiff assented to the terms of the September 29th Lease Agreement or the Funds Release Agreement, those defenses must fail.

82. Having found that the Escrow Instructions were a valid contract, the Court must determine whether Defendants breached the terms thereof.

83. The Court concludes that DEW, as escrow holder, breached its obligation under the Escrow Instructions to "not make any disbursement of funds except as

described [therein,]" (Defs.' Ex. C, Art. IV), because DEW released the funds to Velocity almost immediately after Plaintiff transferred the funds without any documentation being provided to Alkemal with which Alkemal could verify the authenticity of the SBLC. *See Marcuson v. Clifton*, 154 N.C. App. 202, 204–05, 571 S.E.2d 599, 601–02 (2002) (affirming summary judgment in favor of plaintiff on breach of contract claim where defendant escrow agent released escrowed funds in violation of the express terms of the parties' agreement).

84. However, the Court concludes that the Escrow Instructions did not impose any binding obligations on Washington, as escrow officer. As Washington had no contractual obligations under the Escrow Instructions, he cannot be liable for breach of those instructions.

85. Based upon the foregoing, the Court concludes that DEW breached a valid contract with Plaintiff—the Escrow Instructions—and Plaintiff is entitled to compensatory damages as a result. The Court further concludes that Plaintiff has failed to prove, by the greater weight of the evidence, its claim for breach of contract against Washington individually and, accordingly, this claim is dismissed with prejudice.

B. **Breach of Fiduciary Duty**

86. Plaintiff alleges that Defendants breached fiduciary duties owed to Plaintiff pursuant to the Escrow Instructions by releasing the escrowed funds before the conditions of the Escrow Instructions were satisfied. (Compl. ¶¶ 42, 45.)

87. To prevail on its claim for breach of fiduciary duty, Plaintiff must show that: (1) Defendants owed Plaintiff a fiduciary duty; (2) Defendants breached their fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to Plaintiff. *Farndale Co. v. Gibellini*, 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006); *see also Miller v. Burlington Chem. Co.*, 2017 NCBC LEXIS 6, at \*23 (N.C. Super. Ct. Jan. 27, 2017). "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). Courts in North Carolina recognize that "a fiduciary duty can arise by operation of law (*de jure*) or based on the facts and circumstances (*de facto*)[.]" *Lockerman v. S. River Elec. Membership Corp.*, 794 S.E.2d 346, 351 (N.C. Ct. App. 2016). Thus, a fiduciary relationship will arise not only from "all legal relations, such as attorney and client, broker and principal, . . . [and] principal and agent," for example, "but it extends to any possible case in which . . . there is a confidence reposed on one side and a resulting domination and influence on the other." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 293, 603 S.E.2d 147, 155 (2004).

88. "Under well-established principles of North Carolina agency law[,] [a]n agent is a fiduciary with respect to matters within the scope of his agency." *Estate of Graham v. Morrison*, 168 N.C. App. 63, 74, 607 S.E.2d 295, 303 (2005) (quotation marks omitted). "An agent is one who, by the authority of another, undertakes to transact some business or manage some affairs on account of such other, and to render an account of it." *SNML Corp. v. Bank of N.C., N.A.*, 41 N.C. App. 28, 36, 254 S.E.2d 274, 279 (1979). "There are two essential ingredients in the principal-agent

relationship: (1) [a]uthority, either express or implied, of the agent to act for the principal, and (2) the principal's control over the agent." *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 435, 617 S.E.2d 664, 669 (2005). "[T]he critical element of an agency relationship is the right of control." *Coastal Plains Utils., Inc. v. New Hanover Cty.*, 166 N.C. App. 333, 344, 601 S.E.2d 915, 923 (2004) (quotation marks omitted). "Specifically, the principal must have the right to control *both the means and the details of the process* by which the agent is to accomplish his task in order for an agency relationship to exist." *Id.* (quotation marks omitted).

89.     Plaintiff did not exercise control over Defendants' conduct in carrying out the transaction beyond the express terms of the Escrow Instructions. Therefore, the Court concludes that Plaintiff and DEW did not stand in a principal-agent, *de jure* fiduciary relationship by virtue of the Escrow Instructions.

90.     Whether a *de facto* fiduciary relationship exists is generally a question of fact. *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 178, 684 S.E.2d 41, 53 (2009). "The standard for finding a *de facto* fiduciary relationship is a demanding one: 'Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen.'" *Lockerman*, 794 S.E.2d at 352. Additionally, "[p]arties to a contract do not thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract[.]" *Highland Paving Co. v. First Bank*, 227 N.C. App. 36, 43, 742 S.E.2d 287, 292 (2013).

Generally, "parties who interact at arms-length do not have a fiduciary relationship with each other[.]" *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 620–21, 730 S.E.2d 763, 767 (2012).

91.    DEW agreed to be bound by the Escrow Instructions, but no evidence was presented that either Defendant agreed to represent Plaintiff's best interests or that Defendants exerted any special influence over Plaintiff. That Plaintiff was operating under a fast-approaching deadline does not elevate DEW's contractual obligations to that of a fiduciary obligation. Further, Wasan's testimony that she came to rely on and trust Washington as a result of their very limited direct interaction is insufficient to establish that Wasan reposed a special trust and confidence in either Defendant.

92.    The Court concludes that DEW was obligated to act pursuant to the Escrow Instructions, but neither Defendant was thereby obligated to act in Alkemal's best interests pursuant to a *de facto* fiduciary relationship.

93.    Based on the foregoing, the Court concludes that Plaintiff has failed to prove the existence of a fiduciary relationship and, therefore, Plaintiff's second claim for breach of fiduciary duty is dismissed with prejudice.

C.    **Constructive Fraud**

94.    "To establish constructive fraud, a plaintiff must show that defendant (1) owes plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction." *Highland Paving Co.*, 227 N.C. App. at 42, 742 S.E.2d at 292.

95.     Plaintiff alleges that Defendants breached their fiduciary obligations and took advantage of their position of trust to benefit themselves by releasing the escrowed funds to Velocity before the conditions of the Escrow Instructions were satisfied. (Compl. ¶ 54.)

96.     Having concluded that Plaintiff has failed to prove the existence of a fiduciary relationship, the Court concludes that Plaintiff has failed to prove its claim for constructive fraud and, accordingly, Plaintiff's third claim for constructive fraud is dismissed with prejudice.

**D.      Fraud**

97.     The essential elements of a claim for fraud are a "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007). Proof of a fraud claim requires proof of scienter, which requires "an intent to deceive, manipulate, or defraud." *RD & J Props. v. Lauralea-Dilton Enters., LLC*, 165 N.C. App. 737, 745, 600 S.E.2d 492, 498 (2004). "Additionally, reliance on alleged false representations must be reasonable." *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 26, 581 S.E.2d 452, 458 (2003).

98.     Plaintiff alleges in its fourth claim for relief that Defendants, by signing the Escrow Instructions, falsely represented to Plaintiff that they would abide by the terms of the Escrow Instructions, despite knowing that they had already signed or planned to sign the Funds Release Agreement. (Compl. ¶¶ 61–64.) Plaintiff alleges

that Defendants concealed that they had signed or planned to sign the Funds Release Agreement, and that Defendants' concealment and misrepresentations were reasonably calculated to deceive Plaintiff, did in fact deceive Plaintiff, and were intended to induce Plaintiff to wire the funds to DEW. (Compl. ¶¶ 65–66.) Plaintiff alleges in its seventh claim for relief that Defendants, and other defendants previously dismissed from this action, engaged in a scheme to defraud Plaintiff by offering the leased SBLC without any intent to provide that financial instrument to Plaintiff. (Compl. ¶ 82.)

99. Plaintiff did not demonstrate by the greater weight of the evidence that Defendants were responsible for the slip-sheeted September 26th Lease Agreement or that Defendants engaged in any other conduct that would satisfy the requirements for successfully proving the elements of a claim for fraud.

100. Based on the foregoing, the Court concludes that Plaintiff has failed to prove its claims for fraud and, therefore, Plaintiff's fourth and seventh claims are dismissed with prejudice.

**E.**   **Negligent Misrepresentation**

101.   "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 369, 760 S.E.2d 263, 267 (2014). Under well-settled North Carolina law,

> [a] breach of duty that gives rise to a claim of negligent misrepresentation has been defined as:

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, [and thus] is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Rountree v. Chowan Cty.*, 796 S.E.2d 827, 831 (N.C. Ct. App. 2017) (second alteration in original) (quoting *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 534, 537 S.E.2d 237, 241 (2000)).

102. Plaintiff alleges that Defendants represented that they would timely deliver a SBLC to Plaintiff but that the representation was made without reasonable care. (Compl. ¶¶ 70–71.) Plaintiff further alleges that Defendants knew that Plaintiff would rely on Defendants' representation, that the representation was false, and that Plaintiff reasonably relied on the representation. (Compl. ¶¶ 72–74.)

103. Because Plaintiff presented neither evidence nor argument as to how Defendants failed to exercise reasonable care or competence in obtaining or communicating information to Plaintiff, the Court concludes that Plaintiff has failed to establish its claim for negligent misrepresentation. *See Guyton v. FM Lending Servs., Inc.*, 199 N.C. App. 30, 49, 681 S.E.2d 465, 479 (2009) (concluding that plaintiff failed to state a claim for negligent misrepresentation where plaintiff did not allege unintentional or negligent conduct).

104. Accordingly, Plaintiff's fifth claim for negligent misrepresentation is dismissed with prejudice.

## F.  Civil Conspiracy

105.  It is well-established that North Carolina does not recognize a separate cause of action for civil conspiracy. *Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 73 (2008). "Only where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy . . . ." *Sellers*, 191 N.C. App. at 83, 661 S.E.2d at 922.

106.  Plaintiff alleges that Defendants, including defendants who were later dismissed from this action, agreed to defraud Plaintiff and acted in concert by intentionally committing wrongful and unlawful acts in furtherance of the alleged conspiracy. (Compl. ¶¶ 78–79.)

107.  Although it is not entirely clear from the Complaint, Plaintiff's conspiracy claim appears to be based on its fraud claim. Having concluded that Plaintiff has failed to prove its fraud claim, Plaintiff's conspiracy claim fails to the extent that it is premised on the underlying fraud claim.

108.  Even if Plaintiff had succeeded in proving an underlying claim for wrongful conduct, Plaintiff has still failed to prove its claim for civil conspiracy. To establish a claim for civil conspiracy, Plaintiff must demonstrate the existence of a conspiracy, wrongful acts done by certain of the alleged conspirators, and injury. *Newton v. Barth*, 788 S.E.2d 653, 663 (N.C. Ct. App. 2016). As to the first element, Plaintiff must offer "proof of an agreement between two or more persons." *Sellers v. Morton*, 191 N.C. App. 75, 83, 661 S.E.2d 915, 922 (2008). "Although civil liability for conspiracy may be established by circumstantial evidence, the evidence of the

agreement must be sufficient to create more than a suspicion or conjecture . . . ." *Cameron v. New Hanover Mem'l Hosp., Inc.*, 58 N.C. App. 414, 438, 293 S.E.2d 901, 916 (1982). Additionally, "[t]he doctrine of intra-corporate immunity provides that because at least two persons must be present to form a conspiracy, a corporation cannot conspire with itself, just as an individual cannot conspire with himself." *Conleys Creek Ltd. P'ship v. Smoky Mountain Country Club Prop. Owners Ass'n*, 805 S.E.2d 147, 156 (N.C. Ct. App. 2017) (quotation marks omitted).

109. Although the fact that the September 26th Lease Agreement was slip-sheeted strongly suggests foul play on the part of some actor involved in the SBLC transaction, Plaintiff offered no evidence that Defendants conspired with any other person or entity to falsify that agreement. Further, Washington, as president and managing member of DEW, could not conspire with DEW under the doctrine of intra-corporate immunity. *Conleys Creek Ltd. P'ship*, 805 S.E.2d at 156; *see also State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 184 N.C. App. 613, 625, 646 S.E.2d 790, 799 (2007), *rev'd on other grounds,* 362 N.C. 431, 666 S.E.2d 107 (2008).

110. Based on the foregoing, the Court concludes that Plaintiff has failed to prove its claim for civil conspiracy and, therefore, this claim is dismissed with prejudice.

**G. Conversion**

111. A claim for conversion requires that Plaintiff demonstrate "(1) an unauthorized assumption and exercise of right of ownership over property belonging to another and (2) a wrongful deprivation of it by the owner, regardless of the

subsequent application of the converted property." *N.C. State Bar v. Gilbert*, 189 N.C. App. 320, 324, 663 S.E.2d 1, 4 (2008). Stated more concisely, the necessary elements of a claim for conversion are "(1) ownership in the plaintiff, and (2) a wrongful conversion by the defendant." *Bartlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co.*, 192 N.C. App. 74, 86, 665 S.E.2d 478, 489 (2008). "[I]t is of no importance what subsequent application was made of the converted property, or that defendant derived no benefit from the act." *Lake Mary L.P. v. Johnston*, 145 N.C. App. 525, 532, 551 S.E.2d 546, 552 (2001). In general, "money may be the subject of an action for conversion only when it is capable of being identified and described." *Variety Wholesalers, Inc. v Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 528, 723 S.E.2d 744, 750 (2012) (emphasis omitted). Our Supreme Court has held that "funds transferred electronically may be sufficiently identified through evidence of the specific source, specific amount, and specific destination of the funds in question." *Id.* at 529, 723 S.E.2d at 750–51.

112. Plaintiff alleges that it was the lawful owner of the $2.6 million that Defendants converted for their own use or a use other than that for which they were entrusted. (Compl. ¶¶ 88–89.) Although not clear from the Complaint, the Court understands Plaintiff to allege that Defendants converted Plaintiff's funds by refusing to return the $2.6 million after Plaintiff made numerous demands that the money be returned. (Compl. ¶¶ 90–92.)

113. Having found that, under the Escrow Instructions, DEW was obligated to (1) hold the funds until Plaintiff had been given three banking days to verify the

authenticity of the SBLC, and (2) issue Plaintiff a refund of the escrowed funds should the SBLC not issue, the Court concludes that Plaintiff retained ownership rights in the funds and that DEW's failure to hold the funds for the required period of time or to refund Plaintiff's money after the SBLC did not issue was an unauthorized violation of Alkemal's rights to the funds. Because evidence in the record identifies Alkemal's bank account from which the funds originated, shows the exact amount of the funds, and shows DEW's bank account to which the funds were transferred, the Court concludes that the funds are sufficiently identified so as to support a conversion claim against DEW.

114. As DEW's managing member and the individual handling the Alkemal transaction, Washington was aware of the circumstances surrounding DEW's conversion of Plaintiff's funds. "A party who comes into possession of stolen or converted funds will not be permitted thus to use [the] funds when he is fully aware of their nature, or there are circumstances to awaken suspicion and put him on inquiry." *Variety Wholesalers, Inc.*, 365 N.C. at 526, 723 S.E.2d at 749 (alteration in original) (quotation marks omitted). Because the Court was not presented with evidence that any portion of those funds was transferred to Washington, the Court concludes that any funds that were transferred to Washington were not sufficiently identified so as to support a conversion claim against Washington.

115. Based upon the foregoing, the Court concludes that Plaintiff has proven its claim for conversion against DEW and Plaintiff is entitled to compensatory damages.

116. The Court further concludes that Plaintiff has failed to prove its claim for conversion against Washington and, therefore, this claim is dismissed with prejudice.

## H. UDTP

117. To establish a violation of N.C. Gen. Stat. § 75-1.1, a plaintiff must show, by the greater weight of the evidence, "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiff[]." *Highland Paving Co.*, 227 N.C. App. at 45, 742 S.E.2d at 294.

> If a practice has the capacity or tendency to deceive, it is deceptive for the purposes of the statute. "Unfairness" is a broader concept than and includes the concept of "deception." A practice is unfair when it offends established public policy, as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

*Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 230, 768 S.E.2d 582, 598 (2015). "Whether a trade practice is unfair or deceptive depends upon the facts of each case and the impact the practice has in the marketplace." *Mitchell v. Linville*, 148 N.C. App. 71, 74, 557 S.E.2d 620, 623 (2001) (quotation marks omitted).

118. Although not clear from the Complaint, the Court interprets Plaintiff to allege that Defendants' conduct in presenting Plaintiff with the Escrow Instructions and then executing the September 26th and 29th Lease Agreements and the Funds Release Agreement was an unfair or deceptive act or practice that had the capacity to deceive, and did in fact deceive, Plaintiff. (Compl. ¶¶ 97–98.)

119. Having concluded that Plaintiff has not succeeded in proving its claims for breach of fiduciary duty, constructive fraud, or fraud, the Court similarly concludes

that those claims and the underlying conduct alleged do not constitute an unfair or deceptive act or practice in violation of N.C. Gen. Stat. § 75-1.1.

120. Plaintiff has, however, successfully demonstrated that DEW, in breaching its contractual obligations under the Escrow Instructions, converted Plaintiff's funds. "[I]t is true that acts of conversion may constitute [UDTP] . . . ." *Bartlett Milling Co., L.P.*, 192 N.C. App. at 83, 665 S.E.2d at 487. However, the Court concludes, as a matter of law, that the Findings of Fact "do not establish the additional egregious, immoral, oppressive, unscrupulous, or substantially injurious acts needed to impose the heightened penalty of [UDTP]." *Id.* (citing *Moretz v. Miller*, 126 N.C. App. 514, 518, 486 S.E.2d 85, 88 (1997)).

121. Thus, the only remaining issue is whether Defendants' conduct in negotiating and carrying out the parties' contract was unfair or deceptive. "[A] mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [N.C. Gen. Stat.] § 75-1.1" absent a showing of "substantial aggravating circumstances attending the breach" of contract. *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992). "Our case law establishes that '[s]imple breach of contract . . . do[es] not qualify as unfair or deceptive acts, but rather must be characterized by some type of egregious or aggravating circumstances before the statute applies.'" *Supplee*, 239 N.C. App. at 230, 768 S.E.2d at 598 (alterations and omissions in original) (quoting *Norman Owen Trucking, Inc. v. Morkoski*, 131 N.C. App. 168, 177, 506 S.E.2d 267, 273 (1998)). Thus, "[a] violation of Chapter 75 is unlikely to occur during the course of contractual

performance, as these types of claims are best resolved by simply determining whether the parties properly fulfilled their contractual duties." *Mitchell*, 148 N.C. App. at 75, 557 S.E.2d at 624.

122. Having found that the confusion surrounding this transaction and which agreement or agreements controlled was the result of hurried negotiations conducted almost entirely through an intermediary, the Court concludes that DEW's conduct as alleged and proven, including its breach of contract, was not attended by egregious or aggravating circumstances sufficient to warrant a finding that such conduct was unfair or deceptive within the meaning of N.C. Gen. Stat. § 75-1.1.

123. Accordingly, the Court concludes that Plaintiff has failed to prove its claim for UDTP and, thus, this claim is dismissed with prejudice.

## I. Unjust Enrichment

124. To recover under a theory of unjust enrichment, Plaintiff must show "that it conferred a benefit on another party, that the other party consciously accepted the benefit, and that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002); *see also Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). An unjust enrichment claim is based "neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." *Booe*, 322 N.C. at 570, 369 S.E.2d at 556. "If there is a contract between the parties the contract governs the claim and the law will not imply a contract." *Id.*

125. Plaintiff alleges that, in order to obtain the SBLC, it wired $2.6 million to DEW at Defendants' request and based on their promises to procure a SBLC. (Compl. ¶ 103.) Plaintiff further alleges that DEW knowingly and voluntarily accepted the payment, and that Defendants, including defendants previously dismissed from this action, received various amounts of the $2.6 million under circumstances that create a "legal or equitable obligation on the part of those Defendants to account for the benefits received" because Plaintiff received nothing in return. (Compl. ¶¶ 105–06.)

126. Having concluded that the Escrow Instructions were a valid, binding agreement, the Court concludes that Plaintiff's claim for unjust enrichment is precluded by the parties' express agreement, and Plaintiff's tenth claim for relief is therefore dismissed with prejudice.

**J.** **Remedies**

127. Plaintiff's eleventh and twelfth "claims" seeking a constructive trust and an accounting, respectively, are remedies and will be discussed herein below.

**1.** **Compensatory Damages**

128. "The objective of compensatory damages is to restore the plaintiff to his original condition or to make the plaintiff whole." *Watson v. Dixon*, 352 N.C. 343, 347, 532 S.E.2d 175, 178 (2000). An award of damages is intended to give back to a successful claimant "that which was lost as far as it may be done by compensation in money." *Shera v. N.C. State Univ. Veterinary Teaching Hosp.*, 219 N.C. App. 117, 126, 723 S.E.2d 352, 357 (2012) (emphasis omitted).

129. As stated in paragraphs 85 and 115, Plaintiff is entitled to compensatory damages as a proximate result of DEW's breach of contract and conversion of Plaintiff's funds in the total amount of $2.6 million.

130. Plaintiff is further entitled to recover damages in the form of prejudgment interest at the legal rate from the date of breach. The Court has found that Plaintiff became aware that its money had been misdirected on October 2, 2014. The Court finds that prejudgment interest accrues from that date, at the legal rate on the award of $2.6 million.

131. Although Plaintiff's Complaint requests incidental, consequential, and anticipatory damages, (Compl. 15), the Court declines to award such damages because Plaintiff has not provided any proof or argued that it is entitled to such damages or offered any basis on which the Court could calculate such damages. *See Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 547–48, 356 S.E.2d 578, 586 (1987) ("[T]he party seeking damages must show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty.").

### 2. Punitive Damages

132. Punitive damages may be appropriate "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C. Gen. Stat. § 1D-1. However, such damages may only be awarded if the claimant, in addition to proving that the defendant is liable for compensatory damages, also proves that fraud, malice, or willful or wanton conduct

was present. *Id.* § 1D-15. Generally, a party cannot recover punitive damages for breach of contract. *Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531, 558, 643 S.E.2d 410, 427 (2007).

133. Having concluded that the facts attendant to DEW's conversion of Plaintiff's funds do not demonstrate sufficient misconduct to support Plaintiff's UDTP claim, the Court similarly concludes that the facts do not demonstrate fraud, malice, or willful or wanton conduct that would justify an award of punitive damages.

134. The Court concludes that Plaintiff has not demonstrated that punitive damages would be appropriate under the facts and circumstances of this case and, therefore, denies Plaintiff's request for punitive damages.

### 3. Constructive Trust

135. Plaintiff seeks imposition of a constructive trust on Defendants' funds. A constructive trust has been described by our appellate courts as "a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to . . . property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary[.]" *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 415, 537 S.E.2d 248, 264–65 (2000). Constructive trusts, though they may arise in a variety of situations, require that there be some fraud, breach of duty, or other wrongdoing by the holder of the property. *Id.* at 415, 537 S.E.2d at 265. "Constructive trusts ordinarily arise from actual or constructive fraud and usually involve the breach of a confidential relationship." *Carcano*, 200 N.C. App. at 169, 684

S.E.2d at 48 (quotation marks omitted). Although a confidential relationship is not strictly required, in its absence, a plaintiff "faces the difficult task of proving some other circumstance making it inequitable" for a defendant to possess the property in question. *Variety Wholesalers, Inc.*, 365 N.C. at 530–31, 723 S.E.2d at 752 (quotation marks omitted).

136. Although Plaintiff has proven its conversion claim against DEW, the Court concludes that the creation of a constructive trust is unwarranted because Plaintiff's successful contract claim provides an adequate remedy at law. *Estate of Chambers v. Vision Two Hosp. Mgmt., LLC*, 2013 NCBC LEXIS 49, at *18–19 (N.C. Super. Ct. Nov. 21, 2013) (citing *In re Gertzman*, 115 N.C. App. 634, 640–41, 446 S.E.2d 130, 135 (1994); *Branch Banking & Tr. Co. v. Lighthouse Fin. Corp.*, 2005 NCBC LEXIS 4, at *27–28 (N.C. Super. Ct. July 13, 2005) (dismissing constructive trust claim where defendants' assets upon which a constructive trust could be imposed were recoverable through legal remedies available for plaintiff's other claims)).

137. Based on the foregoing, the Court concludes that Plaintiff is not entitled to the equitable remedy of a constructive trust.

### 4. Accounting

138. "The remedy of an equitable accounting may be available when a plaintiff has asserted a valid claim for relief in equity and an accounting is necessary to compel discovery of information regarding accounts held exclusively by the defendant." *Mkt. Choice, Inc. v. New Eng. Coffee Co.*, 5:08-CV-90, 2009 U.S. Dist. LEXIS 73627, at *35–

36 (W.D.N.C. Aug. 18, 2009) (applying North Carolina law); *see also Miller*, 2017 NCBC LEXIS 6, at *36.

139.   Because Plaintiff has proven its breach of contract claim and has a legal remedy for the entirety of the funds transmitted to DEW, the Court concludes that it would be both unnecessary and improper to impose the equitable remedy of an accounting for the same reasons stated above in relation to Plaintiff's request that a constructive trust be imposed.

140.   Based on the foregoing, the Court concludes that Plaintiff is not entitled to the equitable remedy of an accounting.

### 5.    Costs

141.   "In actions where allowance of costs is not otherwise provided by the General Statutes, costs may be allowed in the discretion of the court." N.C. Gen. Stat. § 6-20.  "Costs awarded by the court are subject to the limitations on assessable or recoverable costs set forth in [N.C. Gen. Stat. §] 7A-305(d), unless specifically provided for otherwise in the General Statutes." *Id.*

142.   The Court concludes, in its discretion, that Plaintiff should be awarded its reasonable costs in pursuing claims against DEW.  Plaintiff shall have fourteen (14) days from the date of entry of this Opinion and Final Judgment to file a motion seeking recovery of costs reasonably incurred in the prosecution of this action against DEW along with a supporting brief and appropriate supporting materials.

## V. CONCLUSION

143. Based on the foregoing Findings of Fact and Conclusions of Law, it is **HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

    A.    On account of Defendant DEW's breach of the Joint Escrow Instructions and conversion of Plaintiff's funds, Plaintiff is entitled to recover from DEW the full amount of the funds deposited in escrow in the total amount of $2,600,000.00, plus prejudgment interest at the legal rate from October 2, 2014 and post-judgment interest at the legal rate until the judgment is satisfied.

    B.    Plaintiff shall have fourteen (14) days from the entry of this Opinion and Final Judgment to submit to the Court a motion and supporting brief and materials seeking recovery of Plaintiff's costs in prosecuting this action against DEW.

    C.    All parties shall bear their own attorneys' fees.

    D.    All other requested relief is **DENIED**.

144. Having resolved all claims, this Opinion and Final Judgment constitutes the Court's final judgment.

    **SO ORDERED**, this the 19th day of April, 2018.


                /s/ Michael L. Robinson
                Michael L. Robinson
                Special Superior Court Judge
                  for Complex Business Cases